**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Steven Lee Tucker, | ) |
|      Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| Don Verrett, et al., | ) |
|      Defendants. | ) |

No. CIV 17-192-TUC-CKJ

**ORDER**

Pending before the Court are the Motion for Partial Summary Judgment ("PMPSJ") (Doc. 123) filed by Plaintiff Steven Lee Tucker ("Tucker") and the Motion for Summary Judgment ("DMSJ") (Doc. 129) filed by Defendants.  Responses and replies have been filed.  Also pending before the Court is the Request for Leave of the Court to File an Amended Response and Controverting Statement of Facts to Defendants' Motion for Summary Judgment (Doc. 147).

Because the parties have thoroughly presented the facts and briefed the issues, the Court declines to set this matter for oral argument.  *See* LRCiv 7.2(f); 27A Fed.Proc., L. Ed. § 62:361 (March 2021) ("A district court generally is not required to hold a hearing or oral argument before ruling on a motion."); 27A Fed. Proc., L. Ed. § 62:671 (March 2021) (a hearing on a summary judgment is not required by due process considerations).

I. *Request for Leave of the Court to File an Amended Response and Controverting Statement of Facts to Defendants' Motion for Summary Judgment* (Doc. 147)

Tucker seeks to make technical modifications to his Response and Controverting

1   Statement to Defendants' Motion for Summary Judgment.  The Court accepts Defendants

2   non-response to this request as a consent to the granting of the motion.  *See* LRCiv 7.2(i).

3   The Court will grant this motion and accepts the proposed amendments.

4

5   II.  *Factual and Procedural Summary*

6          Tucker served 24 years in prison for convictions on two counts of attempted

7   molestation of a child under A.R.S. § 13-1410. (Defendants' Statement of Facts ("DSOF"),

8   ¶¶ 5-6, 7, 116.)   On December 18, 2012, the Arizona Board of Executive Clemency

9   ("ABOEC") granted a request by Tucker for release to home arrest.  (DSOF, ¶ 10.)  This

10  release on home arrest was "granted subject to an approved program, acceptance of the

11  standard conditions of supervision, and special conditions, such as all mandatory ADC

12  conditions, no alcohol consumption, and required sex offender treatment and substance abuse

13  programming." (DSOF, ¶ 11, *citing* Ex. A ¶ 12; DSOF, Ex. A, Att. 3, Tucker 0564 (listing

14  special conditions, which could not be modified without prior approval of ABOEC).)  Prior

15  to his release from prison to home arrest, Tucker signed conditions of release and supervision

16  and special conditions.  (*Id.*)

17         On February 25, 2013, Tucker signed the conditions of supervision and release,

18  including special condition of supervision for sex offenders.  (DSOF, Ex. A, Att. 3, Tucker

19  0814-17.) The Conditions of Supervision and Release form ("CS 2/25/13") signed by Tucker

20  included:

21         12.    Special Conditions apply, Form #1002-3SPCL:   ✓ Yes ___ No

22         13.    Special Conditions apply, Form #1002-3SO:     ___ Yes  ✓ No

23         14.    Special Conditions apply, Form #1002-3GPS:    ___ Yes  ✓ No

24  (*Id.* at 0816.) Tucker also signed Conditions of Supervision - Sex Offenders,  Form #1002-

25  3SO ("CSSO 2/25/13").  (*Id.* at 0815; *see also* Plaintiff's First Amended Controverting

26  Statement of Facts ("PCSOF"), ¶ 12.)   The CSSO 2/25/13 included, but was not limited to,

27  requirements that Tucker meet with his supervising officer weekly, wear a Global Positioning

28  System ("GPS") electronic monitoring ankle device, attend sex offender counseling, not have

1   any contact with his victims, not access chat rooms or social media that catered to sex-

2   offender behavior, and not view, purchase , or possess any pornography. (DSOF, ¶¶ 7-8, 15.)

3   Tucker registered as a sex offender. (DSOF, ¶ 9.)

4         On February 26, 2013, upon his release, Tucker reported to the Southern Region

5   Community Corrections Center where he met with Community Corrections Officer (i.e.,

6   parole officer) John March ("March") and again signed conditions of supervision and release

7   forms. (DSOF, ¶¶ 1, 13.) The Conditions of Supervision and Release form ("CS 2/26/13")

8   included:

9         12.   Special Conditions apply, Form #1002-3SPCL:  ✓ Yes ____ No

10        13.   Special Conditions apply, Form #1002-3SO:    ✓ Yes ____ No

11        14.   Special Conditions apply, Form #1002-3GPS:   ✓ Yes ____ No

12   (DSOF, Ex. A, Att. 4, Tucker 0877.)   Tucker also signed a Conditions of Supervision - Sex

13   Offenders and other conditions of supervision and release forms. (*Id.* at 0878-81.) As of

14   February 26, 2013, Tucker was under maximum supervision.

15        On April 5, 2013, J. March visited Tucker's residence and "reconditioned [Tucker]

16   with Home Arrest Conditions." (DSOF, Ex. A, Att. 5, Tucker 0165.) Tucker signed a Home

17   Arrest Authorization and Conditions of Supervision form. (DSOF, Ex. A, Att. 4, Tucker

18   0911-12.) This included, but was not limited to:

19        3.   I will adhere to any other conditions of supervision as may be imposed by the
             Arizona Board of Executive Clemency, or my Parole Officer.
20

21             A.  Return to BOEC for first missed, positive[, or] diluted UA

22             B.  Must complete SO treatment and 12 step substance programming

23             C.  No internet acc unless authorized by parole officer

24             D.  Not to operate motor vehicle unless approved

     (*Id.* at 0912.)
25

26        On June 12, 2013, Tucker again signed special condition 13 and 14, acknowledging

27   that he was subject to the sex-offender conditions and GPS monitoring. (DSOF, Ex. A, Att.

28   4., Tucker 0937-38.)   This acknowledgment included that Tucker would "not view,

1    purchase, or possess any pornography, nor enter any adult entertainment establishment of any

2    kind." (*Id*. at 0937.)  Tucker disputes this summary of Defendants, asserting that he "was not

3    subject to any of these previous conditions while he was on parole." (PCSOF, ¶ 17.)  Tucker

4    cites to Doc. 127-2 at 59 in support of this assertion.  However, that document is the ABOEC

5    Proclamation of Community Parole dated March 20, 2014.  (DSOF, Ex. A, Att. 4, Tucker

6    0070.) This document was issued nine months after Tucker signed special conditions 13 and

7    14 in June of 2013.

8        Tucker signed the Halloween Sex Offender Directives in October 2013.  (DSOF, Ex.

9    A, Att. 4, Tucker 0933.)  The document included "a list of directives [Tucker was] to follow

10   and adhere to for the upcoming Halloween Holiday season and for Halloween day on

11   10/31/13." (*Id*.)  It further provided, "During the holiday season Parole Officers may come

12   to your place of residence to ensure compliance.  These directives are in addition to

13   [Tucker's] Arizona Conditions of Supervision including all special Conditions of Supervision

14   that have been imposed by [Tucker's] Parole Officer." (*Id*.)  Also included in the document

15   was a paragraph initialed by Tucker:

16       I have read, or have had read to me, and fully understand and agree to abide by all
         Conditions of Supervision and release and these Halloween Directives while under
17       the supervision of the Arizona Department of Corrections.  If I fail to abide by any of
         these conditions, I am aware that I may be returned to an institution or the sending
18       state.  I understand that until my maximum sentence expires, I am subject to the rules
         and regulations of the Arizona Department of Corrections.
19

20   (*Id*.)  Tucker also signed and initialed a copy of this document on September 20, 2014.  (*Id*.

21   at Tucker 0883.)  Tucker asserts these documents are not material.  (PCSOF, ¶¶ 21, 40.)

22       Between December 4, 2013, and December 10, 2013, the Sahuarita police department

23   received reports from five different sources that Tucker had been watching children in the

24   neighborhood near a bus stop and/or while hiding in bushes.  (DSOF, ¶¶ 20, 22; DSOF, Ex.

25   A, Att. 4, Tucker 0964.)   Tucker notified March of the police contact and contested the

26   allegations. (PCSOF, ¶ 22; DSOF, Ex. A, Att. 4, Tucker 0067-69.)

27       Tucker's subsequent request for a change in his release status from home arrest to

28   parole was granted on February 20, 2014.  (DSOF, ¶¶ 24-25.)  On January 21, 2014, March

completed a Progress Report for Parole Board Hearing in which no negative information regarding Tucker was included. (DSOF, Ex. A, Att. 3, Tucker 0519.)

On March 20, 2014, Tucker and March signed an ABOEC Proclamation of Community Parole ("Proclamation"). (DSOF, ¶ 20.)  The ABOEC authorized Tucker's "release upon parole to the community in the legal custody and under the control of the ADOC until supervision is terminated as provided by law." (DSOF, ¶ 29.) The parole was authorized under the Proclamation "conditioned upon compliance with those regulations specified by the ADOC for conduct while on parole and such further conditions established by the Board as follows:

> Needs Assessment/Referral (counseling, vocational, educational)
> No Use of Alcohol Random Tests for Drugs/Alcohol
> Continued Participation in NA/AA and Sex Offender Treatment

(DSOF, Ex. A, Att. 4, Tucker 0070.) Defendants assert Tucker "was required to comply with almost all of the same conditions that he was subjected to on home arrest, including his GPS monitoring, sex offender treatment, urinalysis testing, compliance checks, and the special conditions, including not viewing pornography." (DSOF, ¶ 35.) Tucker disputes that he "was subject to compliance checks and special conditions, including those not to view pornography. There is no indication that J. March performed any compliance checks or informed Plaintiff he could not view pornography after the signing of the Parole Order[.]" (PCSOF, ¶34.) A review of the Arizona Department of Corrections Chrono Notes ("Chrono Notes") from February 26, 2013 – July 7, 2015, indicate no discussion between Tucker and a parole officer occurred regarding compliance checks, possible compliance checks, special conditions, or viewing pornography. (DSOF, Ex. A, Att. 5, Tucker 0137-67.) This compares with the note that March "[r]eviewed Halloween Directives with offender." (DSOF, Ex. A, Att. 5, Tucker 0155.)

Defendants assert the "conditions of supervision that Tucker had previously signed did not expire or automatically extinguish when Tucker reverted from home arrest to parole." (DSOF, ¶36.) Tucker asserts there "is no indication that J. March performed any compliance

checks or informed Plaintiff he could not view pornography after the signing of the Parole

Order.  (PCSOF, ¶ 36.)  Specifically, he states:

> Dispute that J. March conducted any compliance checks of Plaintiff's residence, vehicle, or any other property from February 26, 2013 through May 3, 2015, nor did J. March make any notations in the Parole Chrono notes that he had conducted any compliance checks (Doc. 127-2 at 76-86).

(PCSOF, ¶38.)  A review of the Chrono Notes indicate that, after Tucker was placed on

Parole, compliance checks were conducted on October 31, 2014, and May 3, 2015.  (DSOF,

Ex. A, Att. 5, Tucker 0148.)  Additionally, March conducted a field visit on June 21, 2014.

(*Id*. at Tucker 0144.)

> March states:

> In June 2014, during a field visit and an office visit with Tucker, I acknowledged that the ABOEC had waived Tucker's cost of supervision ("COS") fees.  (Attachment 5 at Tucker 0144.)

(DSOF, Ex. A, ¶ 40.)  March, who placed the entry into the Chrono Notes, states COS means

cost of supervision.  (DSOF, ¶¶ 32, 39.)  The Chrono Notes entry for June 30, 2014, states,

"AZ COS waived."  (DSOF, ¶ 39.)  Tucker states, *inter alia*:

> The actual abbreviation used by J. March in the Parole Chrono Notes was "AZ COS" and not "COS" (Doc. 127-2 at 83). There is no mention of the word "fees" in the June 2014 entries in the Parole Chrono Notes (*Id*.). J. March did not testify regarding the February 17, 2015 entry in the Parole Chrono Notes that the "AZ COA [sic] waived BOEC" (Doc. 127-2 ¶ 40). J. March's testimony that the abbreviation "AZ COS" meant cost of supervision ("COS") fees were waived by the ABOEC is refuted by his usage of the abbreviation "AZ COS", as well as the phrase AZ COS Fees", and the word "fees" in the Parole Chrono Notes from February 26, 2013 through May 3, 2015 (Doc. 127-2 76-106). J. March's testimony that the abbreviation "AZ COS" meant the cost of supervision ("COS") fees were waived by the ABOEC is refuted by the fact that Plaintiff's cost of supervision fees was in arrears $975.00 on July 29, 2015 (Doc. 127-2 at 73).

(PCSOF, ¶ 39.)

While on parole, Tucker continued urinalysis testing, sex offender treatment, attending

AA meetings, and GPS monitoring. March continued checking Tucker's employment status,

checking Tucker's GPS coordinates, and reviewing Tucker's requests to go out of town or

extend curfew.  (DSOF, Ex. A, Att. 5, Tucker 0137-48.)  Tucker asserts the GPS monitoring

of Plaintiff was required by Arizona Law A.R.S. § 41-1604.08 and is immaterial regarding

1    applicable parole conditions.  (PCSOF, ¶ 38.)

2        March became aware of the Sahuarita reports that Tucker had been watching children

3    near a bus stop.  (DSOF, Ex. A, ¶ 42.)

4        On April 18, 2015, Parole Supervisor Gregory Smith ("Smith") conducted a field visit

5    to Tucker's residence.  (DSOF, Ex. A, Att. 4, Tucker 0138.)  Smith suggested an unexpected

6    field visit.  (*Id*.)

7        On Sunday, May 3, 2015, March and his supervisor, Senior Parole Officer Don

8    Verrett ("Verrett") participated in a field visit at Tucker's home and conducted a compliance

9    search. (DSOF, ¶¶ 45, 76)  Defendant Richard Zormeier ("Zormeier") provided security

10   services, took photographs, placed handcuffs on Tucker, and escorted Tucker to the

11   transportation vehicle, but had no role in deciding to arrest Tucker.  (DSOF, ¶¶ 45, 77;

12   PCSOF, ¶ 45.)  Maureen Rodriguez ("Rodriguez"), who assisted in the compliance check

13   (including the searches of electronic equipment), and Nickolas Ratkevich, who was assigned

14   as a transportation officer, were also present. (DSOF, ¶¶ 76, 78-9; PCSOF, ¶¶ 45, 85.)

15   Defendant Pamela Jensen ("Jensen"), the Parole Supervisor who signed the written Warrant

16   of Arrest after the arrest, was not present, working, or on-call on the day of Tucker's arrest.

17   (DSOF, ¶¶ 55-56, 124-25.)

18        March and Verrett searched Tucker's home, closets, computers, and devices. (DSOF,

19   ¶¶ 46, 76, 80-83.)  Rodriguez noticed that Tucker's desktop computer had no internet

20   browsing history because Tucker had manually changed the default setting to automatically

21   delete the browsing history upon his exiting the internet web browser. (DSOF, ¶¶ 81-82.)

22   Rodriguez was unable to access Tucker's wife's laptop; Mrs. Tucker said that she had not

23   used the laptop in months, she had recently changed the password, and she could not

24   remember it, even after several attempts.  (DSOF, ¶ 82.)

25        Verrett noticed an iPad that was being charged next to the bed while searching

26   Tucker's bedroom. (DSOF, ¶ 83.)  When Verrett asked Mrs. Tucker if the iPad belonged to

27   her, she stated it belonged to Tucker.  (*Id*.)  When looking at the iPad, Verrett noticed a

28

downloaded application of HBO Go and observed that Tucker was logged in using the ID Name: bat5336 with an email address stucker66@gmail.com.  (DSOF, ¶ 84.)  The following shows were listed on the iPad as viewable: Katie Morgan on Sex Toys; The Best Sex: A Retrospective; Cathouse; and Sexo Urbano: Explore the Erotic World Latin America. (DSOF, ¶ 85.)

Verrett contacted Nicole Studer ("Studer"), the Community Corrections Program Manager in ADC's central office in Phoenix, who was on call in Phoenix. (DSOF, ¶ 86; DSOF, Ex. C. ¶ 20.)  Verret "advised her of Tucker's convictions for dangerous crimes against children, what he understood were Tucker's conditions of supervision and release based on his status as a sex offender on maximum supervision, the Sahuarita police report allegations, the compliance check, the automatic deletion of Tucker's browser history from his desktop, and what he observed on Tucker's iPad." (DMSJ, p. 8, *citing* DSOF, ¶¶ 87, 120.) After Studer authorized an arrest warrant, Verrett obtained warrant number 2015W1583 from ADC Central Office. (DSOF, ¶¶ 92, 121; DSOF, Ex. A, Att. 5, Tucker 0137; DSOF, Ex. C, ¶ 23.)

Defendants state that, on May 3, 2015, Tucker was arrested and taken into custody at ASPC-Tucson for technical violations of Condition 13, prohibiting his viewing or possessing any pornographic material of any kind. (DSOF, ¶¶ 93, 121; DSOF, Ex. A, Att. 4, Tucker 0937; DSOF, Ex. B, Att. 3, Tucker 0137.) Tucker asserts Zormeier told Tucker he was under arrest per Verrett's order and that Tucker was arrested and handcuffed in his living room and then driven to ASPC-Tucson. (PCSOF, ¶¶ 49, 131.)

March completed the paperwork for Tucker's arrest warrant and Jensen, a parole supervisor and Verrett's immediate supervisor, signed the written Warrant of Arrest on May 7, 2015 and backdated it to May 3, 2015.  (DSOF, ¶¶ 55-56, 68, 124-25.)

The parties dispute whether March and Verrett understood and believed that Tucker was subject to the conditions of supervision and release and the special conditions, including special condition 13. (DSOF, ¶¶ 51, 88; PCSOF, ¶ 50, 88.) Defendants assert that at no time

did March know or believe that the conditions of supervision that Tucker had been subject to and that he had been supervising as his parole officer were not applicable to Tucker or not legally effective.  (DSOF, ¶ 51; PCSOF, ¶ 50.)  March and Verrett state the conditions of supervision previously signed by Tucker did not expire or automatically extinguish when Tucker transitioned from home arrest to parole.  (DSOF, Ex. A, ¶ 37; DSOF, Ex. B ¶ 26.) Tucker disputes this and, citing to DSOF exhibits, states that March and Verrett both admitted the February 26, 2013 Condition of Supervision were not applicable to Tucker and not legally effective.  (PCSOF, ¶ 89.)  However, the citations only indicate March knew the fees were waived.

A parole revocation hearing on the alleged parole violations was held on July 6, 2015. (DSOF, ¶¶ 59, 97.)  Tucker asserts multiple witnesses testified that Tucker did not sign any conditions of parole after the Proclamation.  (PSOF, ¶¶ 29-31.)  While Defendants do not dispute that Tucker did not sign conditions of supervision after March 20, 2014, Defendants assert Tucker did sign Halloween Sex Offender Directives acknowledging that he had to comply with the Halloween Directives and all Conditions of Supervision, including all special conditions.  (Defendants' Controverting Statement of Facts ("DCSOF"), ¶¶ 29-33.) Tucker asserts the ABOEC "concluded that [Tucker] was only subject to the conditions of parole that were listed on the Proclamation of Community Parole because Defendants did not have [Tucker] sign any additional conditions of supervision."  (PSOF, ¶33.)  Defendants assert evidence related to events occurring after the May 3, 2015, arrest should be disregarded as hearsay, improperly authenticated and not material.  (DCSOF, ¶¶ 25-33.)

The ABOEC found that Tucker was not in violation of his parole conditions.  (DSOF, ¶ 98.) According to Tucker, the ABOEC "concluded that Tucker was only subject to the conditions of parole that were listed on the Proclamation of Community Parole because Defendants did not have Plaintiff sign any additional conditions of supervision."  (PSOF, ¶

1  33, Exhibit 4 at 0:34:00 to 0:35:00 and 0:37:00-0:41:00; Doc. 83-6, pp. 19-23).[1]  Tucker was

2  released from prison and reinstated on parole on July 8, 2015. (DSOF, ¶ 60.) At that time,

3  he signed another set of conditions of supervision and release.  (DSOF, ¶ 60.)  The parties

4  dispute whether this set of conditions was substantially the same as those he signed in

5  February and June 2013.  (*Id*.; PCSOF, ¶ 60.)  Tucker signed Special Condition 13, which

6  provided that he could not view, purchase, or possess any pornography or sexually

7  stimulating material or products, and could not enter any adult establishment of any kind.

8  (DSOF, ¶ 62; DSOF, Ex. A, Att. 7.)

9  Tucker remained on parole through May 12, 2018, when he completed his sentence.

10  (DSOF, ¶ 64.)  From July 8, 2015, until his release, Tucker continued to sign for and comply

11  with the various conditions of supervision and release, including Special Condition 13.

12  (DSOF, ¶ 63; PCSOF, ¶ 63.)

13  On October 5, 2017, Tucker filed his Second Amended Complaint in this case.[2]  The

14  Ninth Circuit Court of Appeals determined Tucker had stated claims for false arrest and

15  imprisonment as stated in Counts 15 through 17.  These counts allege Tucker was unlawfully

16  arrested, removed, transported, and imprisoned on May 3, 2015.  On June 14, 2021, Tucker

17  filed a Third Amended Complaint ("TAC"), which alleges three claims of false arrest and

18  imprisonment, one each for the arrest of Tucker, the transportation of Tucker, and the

19  continued imprisonment of Tucker, against all Defendants.  (Doc. 83.)  Defendants filed an

20  Answer on June 24, 2021.  (Doc. 85.)

21  On January 9, 2022, Tucker filed a Motion for Partial Summary Judgment ("PMSJ")

22  (Doc. 123.) On January 11, 2022, Defendants filed a Motion for Summary Judgment

23  ("DMSJ") (Doc. 129.)  Responses and replies have been filed.

24

25

26  [1]These exhibits are a recording and what appears to be an unofficial transcript of the revocation proceeding.

27

28  [2]Gail Tucker was also alleged to be a plaintiff in the SAC.  Ms. Tucker was dismissed pursuant to stipulation on January 6, 2021.  (Doc. 57.)

III.  *Summary Judgment Legal Standard*

Summary judgment may be granted if the movant shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The moving party has the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "set forth specific facts showing that there is a genuine [material] issue for trial." *Id.*, 477 U.S. at 248 (internal quotes omitted); *see also Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992) (cannot rely on the allegations of the pleadings, or upon conclusory allegations in affidavits).  The nonmoving party must demonstrate a dispute "over facts that might affect the outcome of the suit under the governing law" to preclude entry of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Further, the disputed facts must be material. *Celotex Corp.*, 477 U.S. at 322-23.  Further, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kiddle & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

The dispute over material facts must be genuine.  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  A party opposing a properly supported summary judgment motion must set forth specific facts demonstrating a genuine issue for trial. *Id.*  Mere allegation and speculation are not sufficient to create a factual dispute for purposes of summary judgment. *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995) (per curiam).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.  However, the evidence

1   of the nonmoving party is to be believed and all justifiable inferences are to be drawn in his

2   favor.  *Id.* at 255.  Further, in seeking to establish the existence of a factual dispute, the non-

3   moving party need not establish a material issue of fact conclusively in his favor; it is

4   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

5   parties' differing versions of the truth at trial."  *T.W. Elec. Serv.*, 809 F.2d 626, 631 (9th Cir.

6   1987).

7          Summary judgment is not to be "too readily" granted in employee discrimination cases

8   because of "the importance of zealously guarding an employee's right to a full trial, since

9   discrimination claims are frequently difficult to prove without a full airing of the evidence

10   and an opportunity to evaluate the credibility of the witnesses."  *McGinest v. GTE Serv.*

11   *Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).  Indeed, "[a]s a general matter, the plaintiff in

12   an employment discrimination action need produce very little evidence in order to overcome

13   an employer's motion for summary judgment.  This is because 'the ultimate question is one

14   that can only be resolved through a searching inquiry—one that is most appropriately

15   conducted by a factfinder, upon a full record.'"  *Chuang v. Univ. of California Davis, Bd. of*

16   *Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000), *quoting Schnidrig v. Columbia Mach., Inc.*,

17   80 F.3d 1406, 1410 (9th Cir. 1996).  However, even in employment cases, "deference to the

18   non-moving party does have some limit."  *Jernigan v. Alderwoods Grp., Inc.*, 489 F. Supp.

19   2d 1180, 1187 (D. Or. 2007); *see e.g. Nelson v. Boeing Co.*, No. 19-35401, 2020 WL

20   3076243, at *1 (9th Cir. June 10, 2020) (summary judgment properly granted on hostile work

21   environment claim because plaintiff failed to raise a genuine dispute of material fact as to

22   whether defendant's alleged conduct was based on his gender or that defendant's conduct was

23   sufficiently severe or pervasive to alter the conditions of his employment); *Denning v. Cty.*

24   *of Washoe*, 799 F. App'x 547, 548 (9th Cir. 2020) (finding summary judgment was properly

25   granted because "isolated offensive remarks" and instances of "unfair treatment" are

26   insufficient to support a hostile work environment claim"); *Manatt v. Bank of Am., NA*, 339

27   F.3d 792, 798 (9th Cir. 2003) ("Viewing the evidence in the light most favorable to Manatt,

28

1   we conclude that the conduct of Manatt's co-workers and supervisor—while offensive and

2   inappropriate—did not so pollute the workplace that it altered the conditions of her

3   employment. Her hostile work environment discrimination claim must therefore fail.");

4   *Pearson v. Reynolds Sch. Dist. No. 7*, 998 F. Supp. 2d 1004, 1022 (D. Or. 2014) (granting

5   summary judgment on Title VII disparate treatment claim where plaintiff failed to establish

6   prima facie case).

7        Additionally, the Court is only to consider admissible evidence. *Moran v. Selig*, 447

8   F.3d 748, 759-60 (9th Cir. 2006) (pleading and opposition must be verified to constitute

9   opposing affidavits); *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991)

10  (declarations and other evidence that would not be admissible may be stricken).  Moreover,

11  "at the summary judgment stage, courts do not focus on the admissibility of the evidence's

12  form.  [Courts] instead focus on the admissibility of its contents." *Marceau v. International*

13  *Broth. of Elec. Workers*, 618 F.Supp.2d 1127, 1141-42 (D.Ariz. 2009).

14       A "genuine" issue of "material" fact cannot be created by a party simply making

15  assertions in its legal memoranda. *Varig Airlines*, 690 F.2d at 1238.  Declarations and other

16  evidence that would not be admissible may be stricken.  *FDIC v. New Hampshire Ins. Co.*,

17  953 F.2d 478, 484 (9th Cir. 1991).  Indeed, a "conclusory, self-serving affidavit, lacking

18  detailed facts and any supporting evidence, is insufficient to create a genuine issue of

19  material fact." *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n. 2 (9th Cir. 2007), *citation*

20  *omitted*.  Moreover, statements must allege personal knowledge.  *See Skillsky v. Lucky*

21  *Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir. 1990) ("Like affidavits, deposition testimony that

22  is not based on personal knowledge and is hearsay is inadmissible and cannot raise a genuine

23  issue of material fact sufficient to withstand summary judgment."); *see also Block v. Los*

24  *Angeles*, 253 F.3d 410, 419 n. 2 (9th Cir. 2001); *Radobenko v. Automated Equip. Corp.*, 520

25  F.2d 540, 544 (9th Cir. 1975), *quoting Perma Research & Development Co. v. Singer Co.*,

26  410 F.2d 572, 578 (2nd Cir. 1969) ("[i]f a party who has been examined at length on

27  deposition could raise an issue of fact simply by submitting an affidavit contradicting his own

28

1    prior testimony, this would greatly diminish the utility of summary judgment as a procedure

2    for screening out sham issues of fact").  Additionally, the court is to review the record as a

3    whole, but must disregard evidence favorable to the moving party that the jury is not required

4    to believe and must give credence to the uncontradicted and unimpeached evidence of the

5    moving party, at least "'to the extent that that evidence comes from disinterested witnesses.'"

6    *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51 (2000), *citation omitted*.

7         The Court recognizes the parties have disputed facts as stated by the opposing party.

8    The Court will only consider the admissible evidence that is supported by specific facts that

9    may show a genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

10    242, 248, 106 S.Ct. 2505, 2510 (1986).

11

12    IV.  *Qualified Immunity*

13         Qualified immunity protects public officials from liability for damages under § 1983

14    if their actions did not violate clearly established rights of which a reasonable person would

15    have known.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  In discussing prison officials,

16    the Ninth Circuit has stated an "official is entitled to qualified immunity if his conduct 'does

17    not violate clearly established statutory or constitutional rights of which a reasonable person

18    would have known.'  *Mendoza v. Blodgett*, 960 F.2d 1425, 1431 (9th Cir. 1992), *quoting*

19    *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[Q]ualified immunity is immunity from

20    suit, not just a defense to liability, and the immunity is effectively lost if a case is erroneously

21    permitted to go to trial.  *David v. Kaulukukui*, 38 F.4th 792, 799 (9th Cir. 2022), *quoting*

22    *Andrews v. City of Henderson*, 35 F.4th 710 (9th Cir. 2022) (cleaned up).

23         The defense of qualified immunity allows for errors in judgment and protects "all but

24    the plainly incompetent or those who knowingly violate the law . . . [I]f officers of reasonable

25    competence could disagree on the issue [whether or not a specific action was constitutional],

26    immunity should be recognized."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Qualified

27    immunity balances the interests of "the need to hold public officials accountable when they

28

1    exercise power irresponsibly and the need to shield officials from harassment, distraction,

2    and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223

3    (2009);    *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021).    Moreover, law

4    enforcement officers "who 'reasonably but mistakenly concluded that probable cause is

5    present'" and justifies an arrest are entitled to qualified immunity. *Hunter v. Bryant*, 502 U.S.

6    224, 227 (1991), *quoting Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

7         "To determine whether an official is entitled to qualified immunity, the court asks (1)

8    whether the [official's] conduct violated a constitutional right, and (2) whether that right was

9    clearly established at the time of the events at issue." *David v. Kaulukukui*, 38 F.4th 792, 799

10   (9th Cir. 2022), *citation and internal quotation marks omitted*.    "While the constitutional

11   violation prong concerns the reasonableness of the officer's *mistake of fact*, the clearly

12   established prong concerns the reasonableness of the officer's *mistake of law*." *Gordon v.*

13   *Cnty. of Orange*, 6 F.4th 961, 968 (9th Cir. 2021), *citation omitted*.    Although the Supreme

14   Court stated that in resolving a government official's qualified immunity claim, a court must

15   first analyze whether a plaintiff alleges facts sufficient to show that the defendant violated

16   the claimant's constitutional rights, *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Court

17   subsequently clarified in *Pearson* that, "while the sequence set forth there is often

18   appropriate, it should no longer be regarded as mandatory," and district courts should

19   exercise their discretion in deciding which of then two prongs to analyze first.    555 U.S. at

20   236; *see also Gordon*, 6 F.4th at 968.

21        Additionally, a court is to evaluate whether a right is clearly established "in light of

22   the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at

23   201. A government official will be entitled to qualified  immunity even if he/she was

24   mistaken in his/her belief the conduct was lawful, so long as that belief was reasonable.

25   *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003).    Further, a "plaintiff bears the

26   burden of proof that the right allegedly violated was clearly established at the time of the

27   alleged misconduct." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021), *quotation*

28

1   *omitted*).

2       Any genuine issues of material fact concerning the underlying facts of what the officer

3   knew or what the officer did are questions of fact for the jury.  *Acosta v. City and County of*

4   *San Francisco*, 83 F.3d 1143, 1149 (9th Cir. 1996), citing *Sinaloa Lake Owners Ass'n v. City*

5   *of Simi Valley*, 70 F.3d 1095, 1099 (9th Cir. 1995).  However, where the essential facts are

6   undisputed, the reasonableness of the officer's actions is properly determined by the court.

7   *Sinaloa Lake Owners Ass'n*, 70 F.3d at 1099; *see also Scott v. Henrich*, 39 F.3d 912, 915 (9th

8   Cir. 1994) ("Even though reasonableness is traditionally a question of fact for the jury,

9   defendant can still win on summary judgment if the district court concludes, after resolving

10  all factual disputes in favor of the plaintiff, that the officer's use of force was objectively

11  reasonable under the circumstances.").

12

13  A.  *Statutory or Constitutional Right*

14      The parties dispute whether Defendants violated Tucker's statutory or constitutional

15  rights when he was arrested, transported, and imprisoned for a parole violation.  As pointed

16  out by the defense, a parole officer needs only to have a reasonable belief that a parolee has

17  violated the terms of his parole in order to effectuate an arrest.  *United States v. Rabb*, 752

18  F.2d 1320, 1324 (9th Cir. 1984), *abrogated in part on other grounds by Bourjaily v. United*

19  *States*, 483 U.S. 171 (1987).  However, neither party has presented any controlling authority

20  or cited to any similar cases which establish whether conditions of release cease or remain

21  in effect when an individual's' status changes from home arrest to parole.[3]   Indeed,

22  Defendants state:

23          No court has found a constitutional violation where the facts are analogous to this
            case; and Tucker will be unable to meet his burden that clearly established law
24          requires new conditions as opposed to re-application of existing conditions when a
            release type changes.
25

26
    _____

27      [3]The Court does not agree with Tucker's reliance on a single decision made *after* the
    arrest of Tucker, by a parole board, without citation to a controlling authority, to establish
28  that conditions of release cease when an individual's status changes to parole.

1   DMSJ (Doc. 129, p. 12).

2       Tucker asserts he was not subject to Special Condition 13 because he did not sign an

3   acknowledgment of those conditions after his status changed from home arrest to parole.

4   Defendants argue, however, that even if the government erred in not having Tucker sign the

5   form, any such mistake would have been a violation of prison regulations or policy, but not

6   a constitutional violation. Indeed, the Ninth Circuit has acknowledged that violations of state

7   law are not protected by § 1983, but are subject to redress under state law. *Ybarra v. Bastian*,

8   647 F.2d 891, 892-3 (9th Cir. 1981). Further, the Supreme Court of Arizona has stated that

9   "[a]lthough written conditions might be desirable in any case upon which a revocation of

10  parole is based, . . . it is [not] required." *Meredith v. Raines*, 131 Ariz. 244, 245 (1982).

11      The Court finds there is no constitutional right requiring a parolee receive and

12  acknowledge written conditions of parole prior to revocation proceedings. However, as

13  previously stated, a parole officer must have a reasonable belief that a parolee has violated

14  the terms of his parole in order to effectuate an arrest of the parolee. *Rabb*, 752 F.2d at 1324.

15      Defendants point out that Tucker had notice of, received copies of, signed, and abided

16  by the conditions for years. Tucker also signed the Halloween directives for sex offenders.

17  The parties dispute whether March and Verrett understood and believed that Tucker was

18  subject to the conditions of supervision and release and the special conditions, including

19  special condition 13. Defendants assert that at no time did March know or believe that the

20  conditions of supervision that Tucker had been subject to and that he had been supervising

21  as his parole officer were not applicable to Tucker or not legally effective. (DSOF, ¶ 51;

22  PCSOF, ¶ 50.)

23      The parties dispute the significance of the Proclamation. Defendants argue the

24  Proclamation establishes that Tucker was subject to the conditions of compliance and

25  regulations by the ADC as well as additional conditions provided by the ABOEC, but did not

26  void the existing conditions that ADC had required. Tucker argues he was only subject to

27  conditions imposed when/after he was placed on parole and that no Arizona Conditions of

28

1   Supervision or any Special Conditions were imposed on Tucker at that time.  If Tucker's

2   argument is correct, he would have been subject to the following conditions:

3          Needs Assessment/Referral (counseling, vocational, educational)
           No Use of Alcohol Random Tests for Drugs/Alcohol
4          Continued Participation in NA/AA and Sex Offender Treatment

5   (DSOF, Ex. A, Att. 4, Tucker 0070.)  However, the Chrono Notes indicate that, after Tucker

6   was placed on Parole, compliance checks were conducted on October 31, 2014, and May 3,

7   2015 and a field visit was conducted on June 21, 2014.  (DSOF, Ex. A, Att. 5, Tucker 0144,

8   0148.)  Further, while on parole, March continued checking Tucker's employment status and

9   reviewing Tucker's requests to go out of town or extend curfew.  (DSOF, Ex. A, Att. 5,

10  Tucker 0137-48.)  In other words, Tucker continued to comply with conditions after being

11  placed on parole that were not included in the Proclamation.

12          Related to this, Tucker continued on GPS monitoring after he was placed on parole

13  although he did not sign Special Condition 12 after being placed on parole.  However,

14  Tucker argues  there is an independent state authority for GPS authority, i.e., his compliance

15  with this condition is not material.  Nonetheless, Tucker's acquiescence to the GPS

16  monitoring is relevant to whether the parole officers knowingly violated the law; i.e., whether

17  they were acting reasonably.

18          Defendants also point out that Tucker did not raise this issue of being subject to

19  conditions of supervision, including the pornography restrictions, until after his arrest for

20  violating special condition 13.  Indeed, Defendants argue Tucker did not raise the

21  applicability of these conditions although he questioned the applicability of the cost of

22  supervision fees.  Tucker does not specifically dispute this assertion.  However, Tucker

23  points out that the Chrono Notes include references to "AZ COS" and "AZ COS fees,"

24  arguing that AZ COS must refer to conditions of supervision rather than conditions of

25  supervision fees because March added "fees" to some of those references.  Tucker appears

26  to be implicitly arguing that the references to "COS" being waived in the Chrono Notes leads

27  to a conclusion that there was nothing for him to dispute.  Indeed, each time "COS" is

28

referenced in the Chrono Notes without "fees" the activity code does not reference COS fees. Rather, the stated activity codes include office or field visits. The Court finds this is a disputed fact.

The parties dispute the significance of the Halloween directives. Defendants argue that because these documents, signed by Tucker, included an acknowledgment that Tucker had to comply with the Halloween Directives and all Conditions of Supervision, including all special conditions, means Tucker was subject to all Conditions of Supervision, including all special conditions. However, this necessarily requires the signing parties to agree on what those Conditions of Supervision, including all special conditions, are in effect. In other words, Defendants are assuming the conclusion. Moreover, the Halloween Directives do not limit the conditions to those for which Tucker has acknowledged. The Court is aware there are special conditions 12 and 13. This leads to an inference that there are special conditions 1-11, for which there is no indication Tucker acknowledged. Accepting Defendants' argument would mean that Tucker was subject to special conditions 1-11, which he never acknowledged. In light of this, the Court cannot find this is a reasonable interpretation of the Halloween Directive. However, while this is a disputed fact as to whether Tucker had sufficient notice of his applicable conditions through the Halloween Directives, the Court determines this is just one factor, and does not address whether the parole officers had a reasonable belief that a parolee had violated the terms of his parole in order to effectuate an arrest or whether there was any authority requiring re-notice of conditions following Tucker's placement on parole.

Tucker also argues the actions of Defendants were not reasonable because they did not adequately investigate whether the HBO Go programs contained content that violated the Conditions of Supervision, whether Tucker had viewed the HBO Go programs. In other words, Tucker asserts Defendants did not have a reasonable belief Tucker had lapsed or was about to laps into criminal ways or company. Defendants argue that Tucker attempt to include a claim under A.R.S. § 31-415, as to whether the warrant was "facially invalid" or

1   failed to allege Tucker had lapsed or was about to lapse into criminal ways is, in effect, an

2   improper amendment of the TAC and should not be considered.  The Court finds it

3   appropriate to consider whether Defendants sufficiently investigated whether Tucker

4   possessed pornography prior to his arrest in determining if Defendants' actions were

5   reasonable.  Indeed, Defendants needed only a reasonable belief their conduct was lawful.

6   They did not need probable cause.  A viewing of the title pages of the videos would lead a

7   reasonable parole officer to believe a parolee was in possession of pornography. (DSOF, Ex.

8   B, Att. 3 at Tucker 0137.)

9           Defendants are entitled to qualified  immunity even if he/she was mistaken in his/her

10  belief the conduct was lawful, so long as that belief was reasonable. *Wilkins*, 350 F.3d at 955.

11  Here, it is undisputed that Tucker repeatedly signed Special Condition 13 while he was on

12  home arrest, but that he did not sign or acknowledge this form after he was placed on parole.

13  Further, the specific conditions included in the Proclamation did not include conditions

14  covered by Special Condition 13.  However, Tucker continued to comply with conditions not

15  included in the Proclamation after he was placed on parole, i.e., he did not contest the

16  validity of these conditions until he was arrested.  Indeed, March continued to monitor

17  Tucker's GPS device, conduct compliance checks, check Tucker's employment status and

18  review Tucker's requests to go out of town or extend curfew.  Additionally, for purposes of

19  determining whether Defendants are entitled to summary judgment, the Court considers that

20  the Chrono Notes included references to the waiver of COS, which do not appear to be

21  referring to the waiver of COS fees.

22          When considering the undisputed facts and resolving factual disputes in favor of

23  Tucker, *Sinaloa Lake Owners Ass'n*, 70 F.3d at 1099; *Scott v. Henrich*, 39 F.3d at 915,  (9th

24  Cir. 1994), the Court finds Defendants acted reasonably.  March and other parole officers

25  continued to act as if they believed Tucker had signed and acknowledged Special Condition

26  13 after he was placed on parole *and/or* the signed and acknowledged conditions continued

27  until Tucker, the person subject to the conditions, was fully released from supervision.

28

1    Additionally, the title pages of the videos appeared to include pornographic material.

2    Defendants are entitled to qualified immunity because, even if they were mistaken in their

3    belief the conduct was lawful, that belief was reasonable. *Wilkins*, 350 F.3d at 955.

4

5    B.  *Clearly Established Right*

6        As previously stated, a right is clearly established "in light of the specific context of

7    the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Further, a "plaintiff

8    bears the burden of proof that the right allegedly violated was clearly established at the time

9    of the alleged misconduct." *Shooter v. Arizona*, 4 F.4th at 961.

10       Tucker argues the right of a parolee to be free from seizure absent a reasonable belief

11   the parolee was in violation of his parole conditions was clearly established on May 3, 2015.

12   Defendants do not dispute this. However, the parties dispute whether there was a reasonable

13   belief Tucker was in violation of his parole conditions on May 3, 2015. Tucker cites to

14   *Samson v. California*, 547 U.S. 843, 852 (2006) and points out that the Supreme Court found

15   a signed, clear and unambiguously expressed condition of parole to be significant in their

16   decision the parolee petitioner "did not have an expectation of privacy that society would

17   recognize as legitimate." *Samson*, 547 U.S. at 852. While the Court found it significant, it

18   did not find it mandatory. In other words, *Samson* does not clearly establish a requirement

19   that a an individual transitioning from home arrest to parole must be re-advised of the

20   conditions of release.

21       In other words, neither party has presented any controlling authority or cited to any

22   similar cases which establish whether conditions of release cease or remain in effect when

23   an individual's status changes from home arrest to parole.[4] Moreover, the Court is unaware

24

25       [4]The Court does not agree with Tucker's reliance on a single decision by a parole

26   board, without citation to a controlling authority, to establish that conditions of release cease

27   when an individual's status changes to parole. Indeed, Tucker has not shown that the

     decision was the result of a reliance on a federal right as opposed to a state right. Further,

28   Tucker cites to testimony in what appears to be an *unofficial* transcript of the July 6, 2015,

- 21 -

1   of any such authority.  As no court has found a constitutional violation in a case similar to

2   this one, the Court finds Tucker has failed to meet his burden that clearly established law

3   requires a parolee to sign and acknowledge new conditions as opposed to re-application of

4   existing conditions when a release type changes.

5

6   C.  *Conclusion as to Qualified Immunity*

7         The Court finds Defendants are entitled to qualified immunity.  The collective

8   knowledge of the parole officers affords that immunity to each of Defendants.  *See United*

9   *States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010) (the collective knowledge doctrine

10  "allows courts to impute police officers' collective knowledge to the officer conducting a

11  stop, search or arrest" if  (1) "law enforcement agents are working together in an

12  investigation but have not explicitly communicated the facts each has independently learned,"

13  or (2) "an officer ... with direct personal knowledge of all the facts necessary to give rise to

14  reasonable suspicion ... directs or requests that another officer ... conduct a stop, search or

15  arrest."); *see also United States v. Ramirez*, 473 F.3d 1026, 1036 (9th Cir. 2007) ("[W]here

16  one officer directs another to take some action, there is necessarily a 'communication'

17  between those officers, and there are necessarily functioning as a team.").

18        The Court finds it appropriate to grant Defendants' Motion for Summary Judgment

19  and to deny Tucker's Motion for Partial Summary Judgment.

20

21  V.  *Zormeier and Jensen – Affirmative Link*

22        Defendants argue no evidence establishes that either Zormeier or Jensen were

23  personally involved in arresting and returning Tucker to prison on May 3, 2015.  Indeed, a

24  civil rights claim requires a plaintiff to have suffered a specific injury as a result of the

25  conduct of a particular defendant and he must allege an affirmative link between the injury

26  _____

27  ABOEC Parole Hearing, which occurred after the May 3, 2015, arrest.  Tucker has not
    presented, for example, a declaration regarding the applicable testimony nor a certified copy

28  of the transcript.

1    and the conduct of that defendant. *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

2          Although Zormeier did not participate in the decision to detain and arrest Tucker, he

3    participated in the detention leading up to the arrest of Tucker. Indeed, it is disputed whether

4    Zormeier told Tucker he was under arrest per Verrett's order.  The Court finds a sufficient

5    link between Zormeier conduct and the injury such summary judgment on this basis is not

6    appropriate.

7          As to Jensen, she did not participate in the arrest of Tucker on May 3, 2015, and did

8    not take any action in this case until May 7, 2015, when she signed and back-dated the arrest

9    warrant.  However, Tucker claims his ongoing incarceration after his arrest violated his

10   Fourth Amendment rights.  The Court finds a sufficient link between Jensen's conduct and

11   the injury such that summary judgment on this basis is not appropriate.

12

13   **VI.** *Absolute Immunity – Studer and Jensen*

14         Defendants argue Studer and Jensen are entitled to absolute immunity for their quasi-

15   judicial actions.  As summarized by another district court, absolute judicial immunity:

16         may be extended to other officials if their "judgments are 'functional[ly] comparab[le]'
         to those of judges-that is, because they, too, 'exercise a discretionary judgment' as part
17       of their function." [*Swift v. Sate of California*, 384 F.3d 1187, 1188 (9th Cir. 2004),
         *citing Pierson v. Ray*, 386 U.S. 547, 553-554 (1967)] (*quoting Antoine v. Byers &
18       Anderson, Inc.*, 508 U.S. 429, 436, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993)
         (quotation omitted)).  The Ninth Circuit has held that the preparation of presentence
19       reports by probation officers is covered by the judicial immunity doctrine because in
         preparing these reports, probation officers act as "an arm of the sentencing judge" and
20       therefore serve a function "integral to the independent judicial process." *Demoran v.
         Witt*, 781 F.2d 155, 157–158 (1986).
21
         On the other hand, "parole officials are not 'entitled to absolute immunity for conduct
22       not requiring the exercise of quasi-judicial discretion.'"  *Swift*, 384 F.3d at 1189
         (quoting *Anderson v. Boyd*, 714 F.2d 906, 909 (9th Cir.1983)).  Thus, in *Swift*, the
23       court held that the plaintiff stated a claim under § 1983 based on alleged violation of
         his Fourth Amendment rights by probation officers who had requested an order
24       revoking the plaintiff's probation, finding that those defendants were not entitled to
         quasi-judicial immunity based on the facts alleged in the complaint.  *Id*. at 1193. In
25       particular, the court found that, construing the allegations in the light most favorable
         to the plaintiff, the probation officers were performing a non-judicial function, "more
26       akin to a police officer seeking an arrest warrant than to a prosecutor exercising
         quasi-judicial discretion to initiate criminal proceedings." *Id*. at 1193; *see also Davis
27       v. Spier*, 2008 WL 1746165 (D.Ariz. April 14, 2008) (holding that probation officer
         who allegedly submitted probation revocation petition on the basis of conduct that
28

probation officer should have known could not have been committed by the plaintiff and requested that court authorize plaintiff's arrest prior to probation revocation hearing was not entitled to quasi-judicial immunity because his conduct was more akin to that of police officer than that of prosecutor deciding whether to initiate proceedings, citing, *inter alia, Swift*); *Puentes v. County of San Mateo*, 2011 WL 4005383 (N.D.Cal. Sept.8, 2011) (holding that whether absolute immunity attached to a probation officer's recommendation to county that plaintiff be cited for a probation violation presented a close question, citing *Davis v. Spier*, but declining to reach)

*Hernandez v. City of Oakley*, No. C-11-02415 JCS, 2012 WL 5411781, **16-17 (N.D. Cal. Nov. 6, 2012).

In other words, although March and Verrett, for example, are not entitled to absolute immunity for their conduct in seeking the warrant, Studer and Jensen are entitled to absolute immunity for their conduct in granting/issuing the warrant because that conduct was exercised a discretionary function similar to that of a judicial officer. Summary judgment in favor of Studer and Jensen is appropriate on the basis of absolute immunity.

## VII.  *Punitive Damages*

Defendants request summary judgment be entered in their favor on Tucker's claim for punitive damages. Defendants assert punitive damages may only be awarded where the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others, *Smith v. Wade*, 461 U.S. 30 (1983); *Ward v. San Jose*, 967 F.2d 280, 286 (9th Cir. 1991). Tucker asserts that, considering the totality of circumstances, he has shown Defendants' conduct was reckless and showed a callous indifference to Tucker's federally protected rights, that Defendants" behavior was outrageous and amounted to a 'witch hunt' and that Defendants' behavior "calls for deterrence and punishment over and above that provided by compensatory awards." *Wade*, 461 U.S. at 54.

Because the Court has found summary judgment is appropriate based on qualified and absolute immunity grounds, this issue is moot. 1A C.J.S. Actions § 76 (Sept. 2022 update), *footnotes omitted* (question is "moot" when it presents or involves no actual controversy,

1  interests, or rights, or where the issues involved have ceased to exist)  1A C.J.S. Actions §
2  76, *footnotes omitted*.

3       Accordingly, IT IS ORDERED:

4       1.     Tucker's Motion for Partial Summary Judgment ("PMPSJ") (Doc. 123) is
5  DENIED.

6       2.     Defendants' Motion for Summary Judgment ("DMSJ") (Doc. 129) is
7  GRANTED.

8       3.     Summary judgment is awarded in favor of Defendants and against Tucker on
9  the basis of qualified immunity.

10      4.     Summary judgment is awarded in favor of Defendants Studer and Jensen and
11 against Tucker on the basis of absolute immunity.

12      5.     The Clerk of Court shall enter judgment and shall then close its file in this
13 matter.

14      DATED this 14th day of September, 2022.

15

16

17       _____
         Cindy K. Jorgenson
18       United States District Judge

19

20

21

22

23

24

25

26

27

28